Consolidated Case Nos. 23-3159, 23-3175, 23-3340, 23-3363, 23-3385

**IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

BRIAN ELKINS and ANNIE ELKINS,
*Plaintiffs-Appellees*,

v.

SOUTHEASTERN INDIANA HEALTH MANAGEMENT, INC., d/b/a COLUMBUS REGIONAL HEALTH,
*Defendant-Appellant*.

On Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division
Case No. 1:23-cv-01117, the Honorable James R. Sweeney, II

# REPLY BRIEF OF DEFENDANTS-APPELLANTS


MATTHEW T. ALBAUGH
PETER S. FRENCH
VIVEK R. HADLEY
**TAFT STETTINIUS & HOLLISTER LLP**
One Indiana Square, Suite 3500
Indianapolis, IN 46204
317.713.3500
malbaugh@taftlaw.com
pfrench@taftlaw.com
vhadley@taftlaw.com

PAUL G. KARLSGODT
**BAKER & HOSTETLER LLP**
1801 California Street, Suite 4400
Denver, CO 80202
303.861.0600
pkarlsgodt@bakerlaw.com

DAVID A. CARNEY
**BAKER & HOSTETLER LLP**
127 Public Square, Suite 2000
Cleveland, OH 44114
216.621.02000
dcarney@bakerlaw.com

*Attorneys for Consolidated Defendants-Appellants*

## TABLE OF CONTENTS


Page

**INTRODUCTION ..... 1**

*A. Plaintiffs' "Private Character" Argument Ignores the Factual Record and Federal Interests Before the Court. ..... 4*

*B. Plaintiffs' "Would Otherwise Have To Do for Itself" Argument Is Out of Place in this Case. ..... 6*

*C. The Defendant Health Care Providers' Actions in these Consolidated Appeals Were Much More than "Mere Compliance with a Regulatory Scheme." ..... 14*

*D. The Removal Clarification Act's "For or Relating To" Causation Standard Is Shown Through Plaintiffs' Allegations and their Theories of the Cases. ..... 17*

*E. Each of Plaintiffs' Complaints Are Grounded in Alleged Violations of HIPAA, Which Form the Duty and the Federal Question Defense for Their Claims. ..... 20*

**CONCLUSION ..... 22**

**CERTIFICATE OF COMPLIANCE ..... 24**

**CERTIFICATE OF SERVICE ..... 25**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Baker v. Atl. Richfield Co.*,
962 F.3d 937 (7th Cir. 2020) .......... 5, 17

*Cons. Fin. Prot. Bur. v. All Am. Check Cashing, Inc.*,
33 F.4th 218 (5th Cir. 2022) .......... 15

*Doe v. BJC Health System*,
89 F.4th 1037 (8th Cir. 2023) .......... 5, 14

*Martin v. Petersen Health Operations, LLC*,
37 F.4th 1210 (7th Cir. 2022) .......... 6

*Mesa v. California*,
489 U.S. 121 (1989) .......... 19, 20

*Mohr v. Trustees of the Univ. of Pa.*,
93 F.4th 100 (3d Cir. 2024) .......... 7, 14

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) .......... 15

*Smith v. Facebook*,
262 F.Supp.3d 943 (N.D.Cal.2017) .......... 20

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) .......... 2

*Stephenson v. Nassid*,
160 F. Supp. 3d 884 (E.D. Va. 2015) .......... 18

*United States Dep't of the Navy v. Fed. Labor Rel. Auth.*,
665 F.3d 1339 (D.C. Cir. 2012) .......... 14

*United States v. Rodriguez*,
797 F. App'x 933 (6th Cir. 2019) .......... 14

**Statutes**

28 U.S.C. § 1442 ........ 3, 14, 17, 21

42 U.S.C. 300jj-11 ........ 13

**Other Authorities**

42 C.F.R. § 495.20 ........ 8, 18

42 C.F.R. § 495.22 ........ 8, 18

42 C.F.R. § 495.24 ........ 8

45 C.F.R. § 495. 24 ........ 18

## INTRODUCTION

Plaintiffs start their response brief from this premise: "For years, Defendant healthcare providers collected sensitive personal information from patients who visited their websites to research health conditions, find doctors, and make appointments." (Resp. Br. 1.)

These cases, however, are not about the collection of sensitive personal information from patients. The information at issue is from buttons clicked on internet websites, that are open to the public at large, whether patient or not: https://www.crh.org/ (App.27 (Columbus Regional Health); http://goshenhealth.org/ (App.211 (Goshen Health); https://www.sarahbush.org/ (App.612 (Sarah Bush Lincoln Health); https://www.hancockhealth.org/ (App.956 (Hancock Health); https://methodisthospitals.org/ (App.1319 (Methodist Hospitals).

The websites could be visited by high-school students conducting research for term papers, by appellate judges looking for more information regarding a particular condition at issue in a case, or by a fan researching the medical condition of his or her favorite celebrity. They can be perused by any individual, for any reason, at any time, who then may go looking for the same information on a different internet

website, for example, https://www.mayoclinic.org/, or https://www.webmd.com/, or maybe even from the federal government itself, https://www.covid.gov/.

As the Ninth Circuit held in affirming the dismissal of an analogous website privacy complaint against Facebook directly and several other healthcare provider defendants: "We do not agree that the collected data is so different or sensitive. The data show only that Plaintiffs searched and viewed publicly available health information that cannot, in and of itself, reveal details of an individual's health status or medical history. Moreover, many other kinds of information are equally sensitive." *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018).

There is, of course, one link on each of these public internet websites that is specifically designed for patients and their caretakers: the patient portal link: https://mychart.crh.org/mychart/Authentication/Login? (Columbus Regional); https://goshenhealth.com/patient-portal (Goshen); https://www.sarahbush.org/patient-portal/ (Sarah Bush Lincoln); https://healthconnect.hancockregional.org/Phm-PhmHome.HomePage.WR.mthr?application=phm&hcis=HAN.LIVEF (Hancock); https://methodisthospitals.org/my-chart/ (Methodist).

These cases are not about any alleged disclosures of information that are occurring from within the portals themselves. Instead, plaintiffs are alleging a privacy violation occurs under Illinois and Indiana state law at the precise moment an individual clicks on that patient portal link. (App.27-28, ¶ 7 (alleging that "[w]hen a person visits a website with an embedded pixel, the pixel tracks 'events' (i.e., user interactions with the site), such as pages viewed, *buttons clicked*, and information submitted)") (emphasis added); *e.g.*, App.612-13, ¶ 8 (same).)

The ability for individuals to be able to click on that link, to be able to immediately access their healthcare information online through an online patient portal, *is exactly what the federal government wanted*, however. The defendants in these cases are thus now facing liability under state law for actions taken under color of federal law: assisting the federal government in making health information immediately available to patients and their caretakers online.

This may seem like a mundane thing. But it brings about the same type of clash between federal interests and the application of state law frustrating these interests that has presented the archetypal situation for federal officer removal under 28 U.S.C. § 1442(a)(1), from the

inception of the statute. The Court should reverse the remand orders below, and hold that these cases correctly belong in federal court.

The health care provider defendants respectfully submit the following reply brief in support of their consolidated appeals:

### A. Plaintiffs' "Private Character" Argument Ignores the Factual Record and Federal Interests Before the Court.

Plaintiffs' predominant argument in their response brief is that "[p]rivate firms retain their private character even when many aspects of their conduct are controlled by federal statutes and rules." (Resp. Br. 2 (quoting *Martin v. Petersen Health Operations, LLC*, 37 F.4th 1210, 1213 (7th Cir. 2022); *id.* at 18 (same).) The healthcare provider defendants do not disagree with this statement, only its application here. The argument diminishes the federal governmental interests at stake in a way that is inconsistent with the factual record before the Court.

As the Office of the National Coordinator for Health Information Technology stated in 2014: "The U.S. Department of Health and Human Services (HHS) has a critical responsibility to advance the connectivity of electronic health information and interoperability of health information technology (health IT). This is consistent with its mission to

protect the health of all Americans and provide essential human services, especially for those who are least able to help themselves." (App.812.)

This is not entirely an altruistic interest, but one borne from practical realities: "The Centers for Medicare & Medicaid Services (CMS) is the largest purchaser of health care in the United States, as its programs pay almost one third of the nation's health expenditures. Through Medicare, Medicaid, and the Children's Health Insurance Program, CMS programs cover roughly 126 million beneficiaries. These federal health systems and payers must coordinate with providers both inside and outside the federal health sector." (App.874.)

These costs are not insubstantial: "National health expenditures were about $3.6 trillion in 2018 and are projected to reach nearly $6.0 trillion by 2027, with annual increases averaging about 5.5 percent. As in previous years, this increase is projected to significantly outpace growth in the overall economy, and healthcare will continue to account for a larger and larger portion of gross domestic product." (App.536.)

While perhaps not as significant as conducting a war, *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 940 (7th Cir. 2020), this is not some garden-variety "voluntary incentive program" either, *compare Doe v. BJC Health*

*System*, 89 F.4th 1037, 1040 (8th Cir. 2023). The federal interest at stake through the federal government's health information technology mission was essential: to improve the efficiency and effectiveness of the nation's health care system through health information technology, of which the federal government is by far the most significant payer and provider of care. (*See also* App.534 ("The Federal Government's Role in Health IT.").)

The Court's decision in *Martin* is thus inapposite to the facts before this Court. The decision is grounded in alleged Medicare reimbursements generally, *see* 37 F.4th at 1213, not in specific payments under the Meaningful Use program that were designed to help the federal government create a national infrastructure for health information technology, including specifically with respect to the creation of online patient portals.

### B. Plaintiffs' "Would Otherwise Have To Do for Itself" Argument Is Out of Place in this Case.

Plaintiffs argue that in order for removal to be appropriate the health care provider defendants must show that the federal government necessarily would have undertaken the same conduct in the absence of private action. As plaintiffs put it: "The question is whether the private actor is doing or helping to do something the government ***would***

***otherwise have to do for itself***." (Resp. Br. 22-23 (emphasis in original).)

Under this argument, removal is not appropriate because "[b]uilding portals for ***Defendants'*** patients is not one of those things." (*Id.* at 23 (emphasis in original).) *See also Mohr v. Trustees of the Univ. of Pa.*, 93 F.4th 100, 105 (3d Cir. 2024) (same; holding that "[a]bsent private action, the federal government itself would not be operating any patient portal").

This argument is also out of place in this case. The federal government could not "build portals" for the healthcare provider defendants, or otherwise make health information immediately available online to patients and their caretakers, because the federal government is not the one providing the care. Instead, the federal government had to find—and did find—a different way to do the same job: by using the power of the purse to make sure that the healthcare provider defendants performed this essential function for the federal government.

And this is the key point: online access to health information was a core component of the Meaningful Use Program. This is expressed, first and foremost, through the requirements that the federal government

required for healthcare providers in order to receive these payments. The receipt of these payments, at every stage, focused on providing online access to patient information in increasing levels. *See* 42 C.F.R. § 495.20 (Meaningful use objectives and measures for EPs, eligible hospitals, and CAHs before 2015); 42 C.F.R. § 495.22 (same for 2015 through 2018); 42 C.F.R. § 495.24 (Stage 3 meaningful use objectives for 2019 and subsequent years).

This federal interest is also expressed, repeatedly and in numerous different types of forums, through the continued statements of the federal government with respect to online access from the first strategic plan in 2011 to the most recent strategic plan in 2020:

- "*Goal IV*, Empower Individuals with Health IT to Improve their Health and the Health Care System," discusses how the government is designing health IT policies and programs to meet individual needs and expectations, provide individuals with access to their information, help facilitate a strong consumer health IT market, and better integrate individuals' and clinicians' communications through health IT. A public that has a voice in designing national health IT policies and

programs and is empowered with access to its health information through useful tools can be a powerful driver in moving toward patient centered health care." (App.392.)

- "However, only 7 percent of Americans have used a web site to access their health information online. Even fewer have used mobile health (mHealth) applications and remote monitoring technologies. These low rates are the result of multiple dynamics: most consumers are not aware of nor able to afford the technologies, do not have access to their health information, or do not expect to take as active a role in their health and health care as they might in other aspects of their lives. As a result, they have not created a robust marketplace for technology innovation. To truly empower consumers and move the health care system to become more patient centered, the government will need to help change these dynamics." (App.423.)
- "The single biggest lever to individual empowerment is access to data. Individual access to data can augment and improve patient-provider communications. It is not meant to replace

this relationship, but rather to enhance it. Such data liquidity will make health IT meaningful for individuals, promote technological innovation, move care to center more on the individual, and ultimately have a direct effect on population health. Right now, there are too many barriers to individual and caregiver access to personal health care information." (App.423.)

- "***The Federal Health IT Taskforce has recognized individual access to data as a primary objective.*** As done with the Blue Button initiative, it will continue to seek ways to align government investments with methods for giving individuals useful and reusable copies of their own data. (App.427 (emphasis added).)
- "An individual can take many steps to improve his or her health, including lifestyle and wellness choices, actively managing his or her health care, and receiving necessary immunizations, preventive care, and long-term services and supports. Engaged individuals are more likely to be proactive in practicing wellness, prevention, and disease management

behaviors. However, health care providers and health insurers offered fewer than three in ten individuals electronic or online access to their medical record in 2013." (App.482.)

- "Market innovations and policies that allow individuals to move and combine information from various sources – whether that information is stored in mobile applications, EHRs, or patient portals, into a single information source to improve health and wellness management – will greatly expand individuals' capability to engage in self-management and contribute to improvements in health care, research, and technology innovation." (App.486.)
- "From shopping for groceries, to requesting transportation, to managing our finances, we have come a long way since the dawn of the internet and mobile devices. However, when it comes to accessing our information when and where we need it, healthcare has just not quite caught up. ***In today's digital world, the right to control our health must include the right to access and control our health information.***" (App.527 (emphasis added).)

- "While most healthcare providers now use electronic health record (EHR) systems, information captured in these systems is often difficult to access by patients, caregivers, and healthcare providers across different settings of care. All healthcare stakeholders will benefit from a fully connected healthcare system that empowers patients, caregivers, and their healthcare providers to access, exchange, and use electronic health information (EHI)." (App.527.)
- "**Objective 1a: Improve individual access to usable health information.** A key aspect of person-centered care is empowering individuals by providing them access to their health information. Health information access allows patients to become more engaged in their care and management of their conditions, and it alleviates strain on caregivers who manage the care of their loved ones. Improving access to EHI—especially for populations in rural areas, persons with disabilities, racial and ethnic minorities, and those with low socioeconomic status—should be prioritized if we are to

achieve equitable care outcomes for all. (App.547 (emphasis in original).)

- "**Enable individuals to access their health information** by ensuring that they can view and interact with their data via secure mobile apps, patient portals, and other technologies." (App. 547 (emphasis in original).)

Plaintiffs dismiss all of these statements as mere "platitudes" and "guidance" (Resp. Br. 27), as if the defendant health care providers should have just ignored what the federal government had to say, no matter how many times the federal government chose to say it. Yet, these statements are not just federal governmental one-offs. All of the above statements are contained in statutorily-mandated federal health information strategic plans, *see* 42 U.S.C. 300jj-11(c)(3) (Strategic Plan), to say nothing of the numerous other documents in the record where similar such statements are made. Notably, plaintiffs are not afraid to rely on federal governmental "guidance" contained in bulletins and press releases when it benefits them. (Resp. Br. 11.)

Quite simply, the record that exists before this Court *following* the enactment of the HiTECH Act and the issuance of the meaningful use

regulations, which the Third and Eighth Circuits did not analyze in the *Mohr* and *BJC* decisions, shows the substantial federal interest at stake. *Compare Mohr*, 93 F.4th at 105-06; *BJC Health*, 89 F.4th at 1045-46 (analyzing acting under requirement without reviewing this record).

### C. The Defendant Health Care Providers' Actions in these Consolidated Appeals Were Much More than "Mere Compliance with a Regulatory Scheme."

Plaintiffs' final acting under argument is that removal is not appropriate because "[m]erely complying with a regulatory scheme, even a highly detailed and onerous one, to advance a government interest cannot support removal under § 1442(a)(1)." (Resp. Br. 16.)

Under *Watson*, there can be no dispute, and the healthcare providers do not dispute, that this is in fact true. Again, however, that is not what is at issue in this case. Private parties do not get paid to comply with the law, even a detailed regulatory regime. And under *Watson* the fact of payment is a significant distinction. This is so for good reason: As the Sixth Circuit has held: "[T]he power of the purse is the power to control." *United States v. Rodriguez*, 797 F. App'x 933, 937 (6th Cir. 2019); *United States Dep't of the Navy v. Fed. Labor Rel. Auth.*, 665 F.3d 1339, 1346-47 (D.C. Cir. 2012) ("The power over the purse was one of the

most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments.'") (quoting *The Federalist No. 51*, at 320 (James Madison, Clinton Rossiter ed., 1961)); *see also Cons. Fin. Prot. Bur. v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 231-32 (5th Cir. 2022) (Jones, J., concurring) ("by most accounts, Congress's fiscal powers are its most formidable tool").

Nor are the healthcare providers contending that payment alone is sufficient to support removal. To the contrary, the payment in these cases should be placed in the context of two additional points. *First,* this was getting paid by the federal government to use technology certified by the federal government to create something that the federal government needed, and could only accomplish through the private sector—providing patients and their caretakers with the immediately ability to access their healthcare information online.

Creating something for the federal government is not "regulation" in any traditional sense. *Compare, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 550 (2012) (rejecting the argument that requiring individuals to purchase health insurance was a form of regulating

commerce; "The power to *regulate* commerce presupposes the existence of commercial activity to be regulated.") (emphasis in original).

*Second*, and more importantly, plaintiffs' claims in these consolidated cases allege that privacy violations occur under Indiana and Illinois state law, respectively, the immediate moment any individual clicks on that patient portal link. (App.27-28, ¶ 7 (alleging that "[w]hen a person visits a website with an embedded pixel, the pixel tracks 'events' (i.e., user interactions with the site), such as pages viewed, *buttons clicked*, and information submitted)") (emphasis added); *e.g.*, App.612-13, ¶ 8 (same).) Clicking on that link, however, was the *sine qua non* reason for these payments: to provide patients with the immediate ability to access their healthcare records online.

Thus, this case raises the same types of tension between the federal governmental interest and plaintiffs' state law claims that has made removal appropriate under the federal officer removal statute from the inception of the statute. There is a one-to-one correlation between the plaintiffs' theory of alleged liability and the defendants' alleged actions that were taken under color of federal law.

Thus also, there is a very basic "federal interest" in the matter. *Baker*, 962 F.3d at 945 (quoting *Willingham v. Morgan*, 395 U.S. 402, 406 (1969)); *see also Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180 (7th Cir. 2012) (same; quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1889)).

### D. The Removal Clarification Act's "For or Relating To" Causation Standard Is Shown Through Plaintiffs' Allegations and their Theories of the Cases.

Plaintiffs correctly do not challenge the healthcare provider defendants' alleged use of tracking technologies on their websites for their acting under analysis, only their creation of online patient portals at the federal government's behest. (Resp. Br. 36-41.) As plaintiffs appropriately recognize, that is a separate matter for causation. (*Id.*)

On this point, plaintiffs argue that "Defendants did not allege that the Meaningful Use program requires participants to surreptitiously collect their patients' personal information." (Resp. Br. 10; *id.* at 38 (same).) But the question for purposes of the causation analysis is not whether or not defendants were "required" to do or not do some specific act under federal law.

Rather, the question is whether or not plaintiffs' claims in the case are "for *or relating to*" the defendants' actions taken under color of federal

law. *See* 28 U.S.C. § 1442(a)(1). The healthcare providers defendants thus do not need to show "that the complained-of-conduct itself was at the behest of" the federal government. *Baker*, 962 F.3d at 944. Rather, we need show only that the challenged acts occurred "because of what they were asked to do by the Government." *Id.* at 943.

And here, there can be no credible dispute that this broad causal connection standard is met. As set forth above, the providing of online access to healthcare information was not the end goal of the federal initiative. The end goal was that individuals would actually, and meaningfully, use these patient portals. Rebecca Mitchell Coelius, *Get the facts regarding view, download and transmit 2014 requirements*, at pg. 1 (published Jan. 31, 2014) ("All providers and hospitals attesting to Meaningful Use in 2014 will need to implement the [view, download, and transmit] VDT capabilities for their patients. Those in Stage 1 will attest for *access*, those in Stage 2 will attest for *use*. The term 'online access' used in the VDT measure definitions refers to all three capabilities – view, download and transmit.").

Plaintiffs' own allegations, accepted as true, show the causal connection between this federal end and the means alleged. Under their

own theory of the case, the whole purpose of these website tools was to drive traffic *to the website*. (App.31, ¶ 23 (alleging Columbus Regional Hospital used the Meta Pixel to, *inter alia*, "improve and save costs on its marketing campaigns," and "attract new patients"); App.34, ¶ 38 (website owners use Facebook tools to "market products and services to individuals"); App.35, ¶ 43 (primary purpose is for "marketing and ad targeting and sales generation").)

In any event, this is one of those cases where, regardless of plaintiffs' allegations on this point, the acting under requirement and the causal connection requirement merge. If the healthcare provider defendants are correct that they acted under color of federal law in making patient portals available to their patients online, then plaintiffs' claims are for or relating to those patient portals.

As set forth above, one of plaintiffs' theories of each of the cases is that clicking this link to access their healthcare records online is in and of itself a privacy violation. *See Stephenson v. Nassid*, 160 F. Supp. 3d 884, 890 (E.D. Va. 2015) (finding causal connection met for employment retaliation claims based upon the filing of a confidential information red flag report; "Counts I, IV, and VI specifically cite the filing of the JPAS

incident report as the basis for defendants' tort liability, and Count III includes the JPAS incident report as one basis for liability"; thus also: "the causal nexus between defendants' compliance with NISPOM § 1-302(a) and the claims under Counts I, III, IV and VI is clear").

### E. Each of Plaintiffs' Complaints Are Grounded in Alleged Violations of HIPAA, Which Form the Duty and the Federal Question Defense for Their Claims.

Finally, for colorable federal defense, plaintiffs argue that "the federal-duty defense Defendants invoke applies only where a plaintiff asserts violations of a 'federally created duty' under a federal statute." (Resp. Br. 42 (citing *Mesa v. California*, 489 U.S. 121, 129 (1989)).

This is not what *Mesa* held, however. The Court's analysis was not focused on federally created statutory duties, but on alleged federally created statutory obligations, that would be sufficient to support the Court's exercise of federal question jurisdiction under Article III: "To assert that a federal statute does *not* impose certain obligations whose alleged existence forms the basis of a civil suit is to rely on the statute in just the same way as asserting that the statute *does* impose other obligations that may shield the federal officer against civil suits." 489

U.S. at 130 (emphasis in original). "Both are equally defensive and equally based in federal law." *Id.*

In any event, plaintiffs' allegations against the healthcare provider defendants over alleged violations of HIPAA, detailed extensively in every complaint, are incorporated by reference unequivocally into every one of their claims. (App.48-App.50, ¶¶ 101-108; App.636-App.639, ¶¶ 99-106.) Thus, even under plaintiffs' theory, these allegations also form the alleged "duty" element of these claims in particular. (App.59, ¶¶ 151, 153 (incorporating by reference all prior allegations for breach of implied contract claim, and alleging that "[i]mplicit in the agreement between CRH and its patients was the obligation that both parties would maintain the Private Information confidentially and securely"); App.647, ¶¶ 149-150 (same for Sarah Bush Lincoln negligence claim).)

Moreover, and as set forth in the introduction, the healthcare provider defendants in these cases will show that plaintiffs' allegations regarding alleged HIPAA violations on their public websites have no merit. *See Smith v. Facebook*, 262 F.Supp.3d 943, 955 (N.D.Cal.2017), *aff'd* 745 F.App'x 8, 9 (9th Cir. 2018) ("The same pages are available to every computer, tablet, smartphone, or automated crawler that send

GET requests to these URLs," and thus also "[n]othing about the URLs, or the contents of the pages located at those URLs, relates 'to the past, present, or future physical or mental health or condition of an individual'") (quoting 45 C.F.R. § 160.103, emphasis in original)).

In affirming this decision on appeal the Ninth Circuit likewise concluded: "Information available on publicly accessible websites stands in stark contrast to the personally identifiable patient records and medical histories protected by [the Health Information Portability and Accountability Act of 1996 (HIPAA) and the California Confidentiality of Medical Information Act (CMIA)]—information that unequivocally provides a window into an individual's personal medical history." *Id.*

## CONCLUSION

The federal government has long recognized that it is good policy to protect the companies that help the federal government in accomplishing federal policy when they are sued precisely for those actions taken under color of federal law by providing them with a federal forum, which policy is now embodied through the broad language of 28 U.S.C. § 1442(a)(1).

The Court should reverse the district courts' remand orders.

**TAFT STETTINIUS & HOLLISTER LLP**

*/s/ Peter French*
Matthew T. Albaugh
Peter S. French
Vivek R. Hadley
One Indiana Square, Suite 3500
Indianapolis, IN 46204
317.713.3500
malbaugh@taftlaw.com
pfrench@taftlaw.com
vhadley@taftlaw.com

**BAKER & HOSTETLER LLP**

*/s/ David Carney*
David A. Carney
127 Public Square, Suite 2000
Cleveland, OH 4114
216.621.0200
dcarney@bakerlaw.com

Paul G. Karlsgodt
1801 California Street, Suite 4400
Denver, CO 80202
303.861.0600
pkarlsgodt@bakerlaw.com

*Attorneys for the Consolidated Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), FRAP RULE 32(g), and CR 32(c)

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32, because this document contains 4,063 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and Cir. R. 32(b) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook style font for the body. There are no footnotes.

Dated: April 12, 2024

*/s/ Peter French*
Peter French

*/s/ David Carney*
David Carney

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024, a copy of the foregoing Reply Brief was served by operation of the Court's electronic filing system which will provide notice to counsel for all parties. Fifteen printed copies of the Reply Brief will be mailed to the United States Court of Appeals for the Seventh Circuit, and one copy to the following counsel, via two-day service:

Lynn A. Toops
Emily Davin Kopp
Mary Kate Dugan
Vess Allen Miller
Amina Thomas
Cohen & Malad, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204

*Counsel for Plaintiffs-Appellees Brian Elkins and Annie Elkins, Kaitlin Lamarr, John Doe, Jennifer Fleece, Keith Chiaro and Jane Doe*

David I. Cates
Katie E. St. John
The Cates Law Firm
216 West Pointe Drive, Suite A
Swansea, IL 62226

*Counsel for Plaintiff-Appellee John Doe*

James Gerard Stranch, IV
Stranch, Jennings & Garvey, PLLC
223 Rosa L. Parks Avenue
Freedom Building, Suite 200
Nashville, TN 37203

*Counsel for Plaintiffs-Appellees Kaitlin Lamarr and Jennifer Fleece*

*/s/ Peter French*
Peter French

*/s/ David Carney*
David Carney